IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARK GRIFFIN,

                Plaintiff,                             OPINION AND ORDER

    v.

                                                             18-cv-674-wmc

JOLINDA WATERMAN,
MARK KARTMAN,
MARIA LEMIEUX and
DR. SCOTT RUBIN-ASCH,

                Defendants.

*Pro se* plaintiff Mark Griffin was incarcerated at the Wisconsin Secure Program Facility ("WSPF") between 2014 and 2018. In 2017, he overdosed on insulin in an apparent suicide attempt. In the aftermath, however, Griffin contends he received no mental health treatment for his attempted overdose. Under the Eighth Amendment, the court granted Griffin leave to proceed against: WSPF officials Jolinda Waterman and Mark Kartman for allegedly failing to train correctional officers properly to administer medications; defendant John Doe for handing Griffin his insulin kit that he used to overdose; and two WSPF psychological staff, Dr. Scott Rubin-Asch and Maria Lemieux, for failing to provide Griffin mental health treatment after his apparent suicide attempt.

Now before the court is defendants' motion for summary judgment. (Dkt. #40.) As an initial matter, the court will dismiss Griffin's claim against the Doe defendant because he failed to amend his complaint to identify this officer timely, nor did he seek leave of court to extend his deadline to amend. As for the remaining claims, the undisputed facts of record establish that: defendants Rubin-Asch and Lemieux provided adequate

mental health treatment for Griffin; and defendants Waterman and Kartman had trained staff in an adequate manner on the administration of medications[1]  Because no reasonable jury could find otherwise on this record, therefore, the court will grant defendants' motion on the merits with respect to Griffin's remaining claims.

UNDISPUTED FACTS[2]

**A. Griffin's insulin administration and mental health**

Plaintiff Mark Griffin is diabetic.  In 2017 he usually self-administered insulin four times per day, which Health Services Manager ("HSM") Waterman explains was consistent with the institution's general practice for long-term medications absent an order to the contrary.  As of September 2017, Griffin's mental health classification was MH-1, meaning that he had no major mental health issues and he was required to be seen by the PSU just every six months.

On September 25, 2017, Griffin was placed on clinical observation status after he showed psychologist Lemieux a bottle of ibuprofen and told her that he wanted to take them.  At the time of this placement, Griffin had not recently overdosed or misused medications, nor had he threatened to overdose or misuse his insulin.  Because Griffin had not explicitly threatened to harm himself with insulin, and because he had not actually harmed himself with any medication that day, Griffin was allowed to have access to his

---

[1] As discussed below, the evidence at summary judgment also calls into question whether Griffin ever faced a substantial risk of serious harm due to his overdose, further undermining his claims for relief under the Eighth Amendment.

[2] Unless otherwise indicated, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying, record evidence as appropriate.

diabetes medication to continue to self-administer in observation.

### B. Griffin's insulin overdose

At about 3:00 p.m. on September 25, Griffin allegedly told Correctional Officer Doe that he did not think he should handle his insulin injections. Doe allegedly responded that the Health Service Unit ("HSU") directed Griffin to perform his injections himself and gave him his insulin kit.[3]

After Griffin took the kit, he self-administered an incorrect dose of 60 units of regular insulin, rather than the prescribed 16 units. While Griffin avers that he took the incorrect amount to commit suicide, it is undisputed that he did not report this to any staff. Instead, Griffin told staff that he took the incorrect amount by mistake because he did not have his glasses and could not see properly. As a result, and it was not immediately clear to staff that Griffin's overdose was a suicide attempt.

HSM Waterman attests that although an overdose of insulin can cause low blood sugar or hypoglycemia, Griffin's overdose, by itself, did not present a medical emergency. Regardless, Griffin's records show that at the time staff encountered him, Griffin had been leaning against the wall and then eased himself to the floor. (Ex. 1004 (dkt. #46-2) 2.) For this reason, Griffin was taken to the HSU for medical evaluation.

In the HSU, staff ordered that Griffin have blood sugar checks every 15 minutes, and that he be given glucose tabs, food and juice if his blood sugar dropped quickly or fell

---

[3] As previously addressed, Griffin still has not identified this defendant by amending his complaint, although in his opposition brief, he argues that two officers -- Shaun Funk and Stephan Schneider -- should have known better than to hand him glass insulin bottles and must have been improperly training in doing so. (*See* dkt. #54, at 8.)

below 100.[4]  HSU also ordered that Griffin be hospitalized if his condition became uncontrolled.  While Griffin contends that he repeatedly asked to go to the hospital and staff ignored him, he does not dispute refusing to comply with the blood sugar checks and refusing the food that was offered to him until arriving at the hospital.  Griffin also concedes that he could have alleviated any risk of harm after his overdose by complying with blood checks and eating.  Moreover, Waterman attests that Griffin *was* eventually sent to the hospital.[5]

At the hospital, which was just two miles away from WSPF, Griffin agreed to blood sugar checks and to eat graham crackers and cereal, as well as to drink juice.  Griffin ended up being returned to WSPF from the hospital after about two hours.  Then, Griffin, remained in clinical observation; his blood sugar level was never recorded as less than 100 mg/DL after his overdose; and he never actually required any emergency treatment.

Further, the next morning, HSU placed a new restriction on nursing staff to administer Griffin's insulin to him while he was in observation.  This restriction was confirmed on September 27, and again on September 30, when Griffin became belligerent and non-compliant with nursing staff for trying to check his blood sugar and administer his insulin.

---

[4] Blood sugar of less than 70 mg/DL is a benchmark for hypoglycemia.

[5] The parties dispute whether this was done "as a precaution," as Waterman attests, or "as an emergency" after he "slumped against a wall," as Griffin maintains.  However, the evidence Griffin cites in support is merely a record of Griffin's appearance when he was first seen in the HSU, before being returned to his cell with the blood check and food/drink orders.  (*See* Ex. 1004-002 (dkt. #46-2).)  So, Waterman's representation as to the reason why Griffin was sent to the hospital is undisputed.

After Griffin's overdose, Waterman also issued a memorandum to Griffin that he was being placed on a canteen restriction. That restriction prohibited him from self-administering other medications offered by the canteen, despite only offering over-the-counter medications like ibuprofen.

### C. Griffin's post-overdose interactions with psychological services

As for Griffin's claim that he was denied needed mental health treatment following his "overdose," Dr. Rubin-Asch attests that the records of his contacts with WSPF psychological services provider do not show any type of severe emotional distress that had worsened after this event. Plus, while Griffin was on observation status immediately after, he was observed several times per hour and received mental status evaluations every day. In particular, psychologist Lemieux performed mental status evaluations on Griffin on September 25, 26 and 27, and a non-defendant, psychological associate Mink saw Griffin on September 28. Nevertheless, immediately after his overdose, Griffin's primary concerns related to his television set being broken or issues with other inmates regarding gambling debts or wanting his meals and medications. Similarly, Griffin's contemporaneous records show no reports of self-harming thoughts, much less new acts of self-harm. Rather, Griffin expressed concerns about going back to his old cell because other inmates were bullying him. As a result, when Griffin was released from observation on September 28, he was sent to a different unit.

Lemieux next met with Griffin on September 29, who not only affirmatively denied suicidal ideation, but actually reported that he was "pretty good." Griffin also met with a psychiatrist later that same day, during which his medications were adjusted, he again

5

denied any suicidal ideations, and he was scheduled for a follow-up with Lemieux in a week. At this follow up with Lemieux on October 5, Griffin again denied suicidal ideation and reported that he was doing well and his mood was all right, prompting Lemieux to write that his treatment plan going forward was only to be seen "upon reasonable request."

### D. Medication administration policy and practice

Under DAI Policy #500.80.11 for "Medication Delivery, Administration, and Training," non-medical staff may dispense certain medications and inmates may refuse medications. Neither Security Director Kartman nor defendant Waterman created this policy, nor may either modify this policy. More specifically, Kartman explains that whether an inmate in observation receives medication is a decision for HSU or psychological services unit ("PSU") staff, as is who will administer medications or what medications will be administered to inmates.

There also is no policy or training that specifically requires staff to give medications to inmates who state a desire to harm themselves with the medication. However, if an inmate declines a medication because he will use it to commit suicide, that should be considered a "refusal," and the medication should not be given.

## OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, then the non-moving party must

6

provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). On this record, defendants seek summary judgment on the merits of each of plaintiff Griffin's claims.

The Eighth Amendment prohibits prison officials from responding with "deliberate indifference" to a "substantial risk of serious harm" to an inmate's health or safety. *Id.* at 836. "Serious harm" includes a substantial risk of serious *self*-harm. *See Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). Thus, deliberate indifference to a substantial risk of self-harm is present when an official is subjectively "aware of the significant likelihood that an inmate may imminently" harm himself, yet "fail[s] to take reasonable steps to prevent the inmate from performing the act." *Pittman ex* rel*. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775-76 (7th Cir. 2014) (citations omitted); *see also Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 665 (7th Cir. 2012) ("[P]rison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies.").

The Eighth Amendment also recognizes a prisoner's right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A medical need is "serious" if it: so obviously requires treatment that even a lay person could recognize the need for medical

7

attention; carries risk of permanent serious impairment if left untreated; results in needless pain and suffering; *or* significantly affects an individual's daily activities. *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997). "Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, acts of deliberate indifference require *more than* negligence, or even gross negligence, but something less than *purposeful* acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

Defendants seek dismissal of the Doe defendant as an initial matter because Griffin failed to timely amend his complaint to identify this defendant. They also seek summary judgment as to all defendants because the evidence of record does not show that Griffin faced a serious risk of harm; as to Waterman and Kartman because no evidence of record suggests that they were responsible for a policy or procedure that subjected Griffin to a substantial risk of serious harm; and as to Rubin-Asch and Lemieux because neither of them consciously disregarded Griffin's need for mental health treatment.

I.  Doe Defendant

To start, the court is dismissing Griffin's claim against the Doe defendant. The court granted Griffin leave to proceed against the Doe officer, and subsequently set June 17, 2022, as Griffin's deadline to file an amended complaint identifying any Doe defendants. (Dkt. #54, at 2, 8.) However, he neither filed an amended complaint identifying the Doe defendant by that deadline, nor did he seek an extension of that

deadline or indicate to the court that he needed assistance to do so. Although the court notes that he filed multiple requests for assistance in recruiting counsel, Griffin never indicated that he was having trouble identifying the Doe defendant who provided him with the insulin that he used to overdose. (*See* dkt. ##33, 37.)

Now, in his opposition brief, Griffin argues that two correctional officers, Shaun Funk and Stephan Schneider, would have known better than to hand an inmate glass bottles of insulin. But Griffin's opposition brief is not evidence, and importantly, he does not attest or represent that Funk or Schneider was responsible for handing him the bottle on September 25, 2017. At least as importantly, were Griffin attempting to identify the Doe defendant in his opposition brief, he has not shown good cause for the court to accept this late amendment to his complaint. This failure is significant because allowing Griffin to amend his complaint at this late stage would surely prejudice defendants, who have been diligently litigating this case. *See Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008) ("[D]istrict courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile."). Accordingly, Griffin's claim against Doe will be dismissed with prejudice.

II.     **Serious Risk of Harm**

As for the remaining defendants, the evidence of record certainly calls into question whether Griffin's overdose created substantial risk of serious harm or presented with an objectively serious medical condition to implicate his Eighth Amendment rights. In

9

particular, it is undisputed that Griffin initially refused to have his blood sugar measured in the HSU, and that ultimately his blood sugar level at the hospital was never below 100 mg/DL, when he was eventually tested at the hospital. It is also disputed that Griffin required no emergency interventions of any kind, either at the hospital or back at WSPF. Rather, the only interventions provided at the hospital were the same as Griffin was offered and refused in the HSU: to have his blood sugar checked and to consume food and water. Significantly, therefore, Griffin does not dispute that *he* had the power to alleviate any risk of harm simply by allowing the monitoring of his blood sugar and eating foods that were offered to him in the HSU at WSPF, but he refused both.

Griffin attempts to excuse his refusal to eat food in the HSU while still at WSPF because he did not trust the nursing staff and believed the food was poisoned, but Griffin does not explain why he held these beliefs. Regardless, without some evidence suggesting that Griffin's stated beliefs had any legitimate basis, no reasonable jury would credit it. Further, even assuming for the sake of argument that Griffin had a legitimate reason to refuse blood checks and forego eating or drinking, his transport to the hospital was brief, when he arrived at the hospital he was able to eat and drink, and none of his records from that hospital visit suggest that his condition ever deteriorated, much less that his health was ever in jeopardy at any point.

In fact, the only evidence suggesting that Griffin's overdose presented a substantial risk of serious harm or presented with an objectively serious medical condition are Griffin's own assertions in his opposition brief that he was experiencing dizziness, weakness, an inability to stand, blurred vision, sweating, shaking and a severe headache. (*See* dkt. #54,

at 3, 6.) However, it is undisputed that Griffin refused treatment from the HSU and when his blood sugar was checked after he arrived at the hospital, it never went below 100 mg/DL. That measurement suggests that Griffin was never actually hypoglycemic or even at substantial risk of being so.

For these reasons, no reasonable trier-of-fact could conclude on this record that Griffin faced a substantial risk of serious harm, much less presented with an objectively serious medical condition because of the overdose.

### III. Other Defects in Plaintiff's Remaining Claims

#### A.    Waterman and Kartman

To the extent Griffin's reported any symptoms before his hospital visit arguably made proof of his objective medical condition a closer call, WFPS officials Waterman and Kartman also seek summary judgment because they were not responsible for a constitutionally infirm policy or practice, and they did not otherwise consciously disregard a substantial risk to Griffin's safety. Indeed, Griffin merely argues without proof that Waterman and Kartman are somehow responsible for the officer who provided him insulin while he was on clinical observation status, but no reasonable jury could find either of these defendants liable under these circumstances presented at summary judgment.

Supervisors may be liable under § 1983 for failing to train their employees, *Kitzman-Kelley v. Warner,* 203 F.3d 454, 459 (7th Cir. 2000). However, the supervisor must know that the training being provided is *so inadequate* that employees are likely to violate the constitution as a result. *Ghashiyah v. Frank,* No. 07-C-308. 2007 WL 5517455, at *2

11

(W.D. Wis. Aug. 1, 2007) (citing *Mombourquette ex rel. Mombourquette v. Amundson,* 469 F. Supp. 2d 624, 651 (W.D. Wis. 2007)).  To establish liability, plaintiff must prove that the supervisor was *personally* involved in the conduct by "facilitate[ing] it, condon[ing] it, or turn[ing] a blind eye for fear what they might see." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001).

While Griffin claims that the officer who provided him his insulin injection kit allowed him to commit self-harm, he points to no DOC or WSPF policy directing an officer to give an inmate threatening self-harm any device that could be used for self-harm. Regardless, there is no proof that either Waterman nor Kartman was aware that an officer might allow Griffin to harm himself with the insulin, nor did either defendant authorize or become otherwise involved in an officer providing Griffin his insulin despite his alleged statement that he would attempt to overdose.  To the contrary, both Kartman and Waterman attest that such behavior by an inmate should have been treated as a refusal of medication under DAI #500.80.11.  Therefore, no reasonable jury could conclude that either defendant Kartman or Waterman had consciously disregarded a risk that Griffin would seriously harm himself in clinical observation status if he were allowed access to his insulin injections.

Finally, any claim that defendant Waterman should have terminated Griffin's ability to self-administer his insulin when he was placed on clinical observation status on September 25, 2017, fails as a matter of law.  Before September 25, Griffin had not abused his insulin or any other medication, nor had he threatened to overdose on insulin, and he had been properly taking his insulin injections four times a day for years.  No evidence of

record suggests that Waterman in particular had reason to believe that because Griffin had threatened to overdose on ibuprofen, he might now overdose on his insulin. And in Waterman's professional opinion as a nurse, she also had reason to know that an overdose of insulin would not necessarily present a substantial risk of harm in the first place. Thus, without some objective indicia that Griffin would abuse his insulin in a manner capable of seriously harming himself, no reasonable trier-of-fact could conclude that she handled his threat of self-harm with deliberate indifference. Therefore, both Kartman and Waterman are entitled to summary judgment.

### B. Lemieux

Lemieux is also entitled to summary judgment on other grounds. To begin, there is no evidence that Griffin ever reported to Lemieux that he felt suicidal, despite Lemieux meeting with him multiple times to discuss his mental health. And although Griffin seems to suggest that someone in the HSU should have addressed his mental health between his insulin overdose in observation and when he went to the hospital, he does not explain how Lemieux could have intervened to address any mental health concerns between his overdose and when he returned from the hospital that same evening. Even assuming that Lemieux or any other PSU staff was aware of Griffin's overdose during this short period of time, Griffin had not identified his overdose as a suicide attempt to HSU staff at that time, and no evidence suggests that any defendant had reason to believe that he needed mental health treatment while he was in the HSU or at the hospital on the 25th. Finally, there is no dispute that Griffin was being closely monitored throughout that period, thus substantially reducing any remaining risk of another overdose or another type of serious

13

self-harm. Therefore, any absence of immediate mental health attention did not necessarily place him at substantial risk of serious harm, nor does Griffin offer proof of any Because no evidence suggests that defendant Lemieux consciously disregarded Griffin's need for mental health attention following his apparent overdose, she, too, is entitled to summary judgment.

### C. Dr. Rubin-Asch

Finally, Dr. Rubin-Ash is entitled to summary judgment. Again, personal involvement in a constitutional violation is a prerequisite for liability under § 1983. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). Here, *no* evidence would support a reasonable jury to find that Dr. Rubin-Asch was involved in the initial decision to place Griffin on observation status, nor in any determination that he could continue his long-standing practice of self-administering insulin while in observation status. Further, no evidence of record suggests that Dr. Rubin-Asch was aware Lemieux or any other PSU staff had improperly allowed a diabetic inmate with a long history of self-administering insulin to continue that practice while in clinical observation status for threatening self-harm. For all these reasons, no reasonable jury could find that Dr. Rubin-Ash was involved in any of the events comprising Griffin's claims, and he is entitled to summary judgment for lack of personal involvement as well.

### ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #40) is GRANTED.

2. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 10th day of July, 2023.

                                       BY THE COURT:

                                       /s/

                                       _____
                                       WILLIAM M. CONLEY
                                       District Judge